**IN THE U.S. DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **PERRY L. OATIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 2:23-cv-02163-JWL** |
| | ) | |
| **JAY ARMBRISTER, MAJOR BUNTING,** | ) | |
| **CAPTAIN ROOME, MELANIE STRODA,** | ) | |
| **TAMMI, R.N., and ADVANCED** | ) | |
| **CORRECTIONAL HEALTHCARE, sued in** | ) | |
| **their official and individual capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS ADVANCED CORRECTIONAL HEALTHCARE, INC., MELAINE STRODA . NP, AND TAMARA LYLES, RN'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants Advanced Correctional Healthcare, Inc., Melanie Stroda, NP, and Tamara Lyles, RN, by and through undersigned counsel, respectfully submit this memorandum in support of their Motion for Summary Judgment. Defendants are entitled to summary judgment as a matter of law because Plaintiff has failed to plead the requisite evidence to support Plaintiff's claims.

**NATURE OF THE CASE AND MATTER BEFORE THE COURT**

At all times relevant to this action, Plaintiff Perry Oatis ("Oatis") was an inmate in the custody of the Kansas Department of Corrections ("KDOC") at Douglas County Correctional Facility ("DCCF"). Plaintiff alleges he was denied medical treatment for his hip condition and osteoarthritis, resulting in deliberate indifference to a serious medical condition, cruel and unusual punishment, medical negligence, and intentional infliction of emotional distress.

## INTRODUCTION

This lawsuit arises from the alleged denial and delay of medical treatment to Plaintiff Perry Oatis ("Mr. Oatis"). Mr. Oatis entered DCCF on May 27, 2019, where he was incarcerated until March of 2024. Mr. Oatis alleges that he presented with a gaited walk upon his entry to DCCF, suggesting that his medical condition was obvious to Defendants. Mr. Oatis further alleges that Defendants received a medical report from Heartland Community Healthcare Center on November 6, 2019, which allegedly contained reports of Mr. Oatis' his ankle, knee, and hip conditions.

To address Mr. Oatis' alleged medical needs and requests for medical treatment during his incarceration, Defendants provided a variety of appropriate treatment through the administration of pain medication, provision of an additional mattress, provision of medical shoes, and referrals to outside medical providers.

## STATEMENT OF UNCOTROVERTED FACTS

Defendants set forth the following uncontroverted facts solely for the purposes of this Motion for Summary Judgment. Defendants reserve the right to dispute these facts in any trial of this matter.

1. The events of Plaintiff's claim arose when Plaintiff was incarcerated at DCCF. **Plaintiff's Complaint, attached hereto as Exhibit 1.**

2. On November 6, 2019, Mr. Oatis complained of numbness in his foot. **Medical/Mental Health Services Request Form**, **attached hereto as Exhibit 2.**

3. On April 19, 2020, medical shoes were approved for Mr. Oatis. **Medical/Mental Health Services Request Form, attached hereto as Exhibit 3.**

4.  On December 21, 2020, Mr. Oatis was informed that an outside provider appointment had been scheduled with a specialist for his hip pain. **Medical/Mental Health Services Request Form, attached hereto as Exhibit 4.**

5.  On February 3, 2021, an unidentified physician assistant at OrthoKansas spoke with Defendant Lyles and opined that Mr. Oatis' hip replacement surgery was an elective procedure and should be deferred until Mr. Oatis is no longer incarcerated. **Narrative Progress Note, attached hereto as Exhibit 5.**

6.  On March 31, 2021, Mr. Oatis underwent excision of anterior ankle spur and decompression of the superficial peroneal nerve (SPN). **Narrative Progress Note, attached hereto as Exhibit 6.**

7.  On March 31, 2021, Mr. Oatis was prescribed oxycodone and ice to manage his reported pain. **Lawrence Surgery Center Prescription, attached hereto as Exhibit 7.**

8.  On June 29, 2021, Luis Salazar, MD of OrthoKansas evaluated Mr. Oatis. Dr. Salazar recommended that Mr. Oatis schedule an appointment with James Hutton, MD or Adam Goodyear, MD for further treatment options for Mr. Oatis' left hip. **Ortho Office Note, attached hereto as Exhibit 8.**

9.  On July 22, 2021, Adam Goodyear, MD of OrthoKansas evaluated Mr. Oatis. Dr. Goodyear recommended a cortisone injection for Mr. Oatis' hip. However, Mr. Oatis refused said recommended injection. **Ortho Office Note, attached hereto as Exhibit 9.**

10. On August 10, 2021, Mr. Oatis was informed that he had been placed on the list to see a practitioner at DCCF per Mr. Oatis' request for an increase in Tramadol dosage. **Narrative Progress Note, attached hereto as Exhibit 10.**

11. On August 18, 2021, James Hutton, MD of OrthoKansas evaluated Mr. Oatis. Dr. Hutton recommended that Mr. Oatis' hip surgery be deferred until Mr. Oatis was no longer incarcerated due to the risk of infection and difficulty with adequate rehab regimen. **Ortho Office Note, attached hereto as Exhibit 11.**

12. On September 29, 2021, Mr. Oatis informed ACH staff that he no longer trusted the medical providers at OrthoKansas. Mr. Oatis requested to be seen by a specialist in Kansas City. **Medical/Mental Health Services Request Form, attached hereto as Exhibit 12.**

13. On January 11, 2022, Dr. Salazar of OrthoKansas evaluated Mr. Oatis. Dr. Salazar recommended a hip injection, which was refused by Mr. Oatis. Dr. Salazar then recommended Mr. Oatis be provided with a softer mattress. **Office/Clinic Provider Documentation attached hereto as Exhibit 13.**

14. On January 13, 2022, Mr. Oatis was offered two new mattresses to address his complaints. However, Mr. Oatis refused said mattresses. **Medical/Mental Health Services Request Form, attached hereto as Exhibit 14.**

15. On February 14, 2022, Mr. Oatis requested an update as to his upcoming appointment for pain in his left ankle. Mr. Oatis was informed that Covid-19 restrictions had delayed his appointment as a negative Covid-19 test must be provided before his appointment. **Medical/Mental Health Services Request Form, attached hereto as Exhibit 15.**

16. On May 23, 2022, an appointment was scheduled at OrthoKansas for June 16, 2022, for Mr. Oatis. **Ortho Office Note, attached hereto as Exhibit 16.**

17. On June 16, 2022, Karen Tsia, PA of OrthoKansas evaluated Mr. Oatis. **Office/Clinic Provider Documentation, attached hereto as Exhibit 17.**

18. On July 5, 2022, Luis Salazar, MD of OrthoKansas evaluated Mr. Oatis. **Office/Clinic Provider Documentation, attached hereto as Exhibit 18.**

19. On July 13, 2022, Mr. Oatis stated that he was experiencing physical and emotional anguish arising from his alleged medical condition and subsequent chronic pain. **Medical/Mental Health Services Request Form, attached hereto as Exhibit 19.**

20. On August 1, 2022, Defendant Lyles requested a referral to an orthopedic physician in Kansas City on Mr. Oatis' behalf. **Narrative Progress Note, attached hereto as Exhibit 20.**

21. On August 29, 2022, Mr. Oatis' appointment with OrthoKansas was rescheduled after Mr. Oatis was informed of the original appointment date, which conflicted with DCCF's security policy. **Narrative Progress Note, attached hereto as Exhibit 21.**

**22.** On November 17, 2022, Michael Perry, MD of the University of Kansas Health System evaluated Mr. Oatis. Dr. Perry diagnosed Mr. Oatis with end-stage osteoarthritis and recommended a total hip arthroplasty. **University of Kansas Note, attached hereto as Exhibit 22.**

23. On November 30, 2022, an appointment was scheduled for Mr. Oatis' arthroplasty surgery. **Medical Referral, attached hereto as Exhibit 23.**

24. On December 14, 2022, Mr. Oatis was informed that Dr. Perry did not have availability for a surgery appointment until 2023. Mr. Oatis was also informed that pre-operative testing needed to be performed before the arthroplasty surgery could occur. **Medical/Mental Health Services Request Form, attached hereto as Exhibit 24.**

25. Pursuant to the Scheduling Order, Plaintiff was required to designate his expert witnesses on or before May 17, 2024. **Scheduling Order, attached hereto as Exhibit 25.** Plaintiff failed to designate his experts by this deadline.

## I.      STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

When a party brings a lawsuit pro se, the court construes the party's pleading liberally and holds them to a less stringent standard than formal pleadings drafted by lawyers. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, the court does not assume the role of a *pro se* litigant's advocate or excuse them from the burden of alleging sufficient facts to support a recognized legal claim. Id.  Nor does a plaintiff's *pro se* status relieve them from the consequences of noncompliance. *Ogden v. San Juan Cty.*, 32 F.3d 452, 455 (10th Cir. 1994) (*citing Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994)).

## II.      ARGUMENTS AND AUTHORITIES

A. Plaintiff Failed to Sufficiently Plead a Fourteenth Amendment Violation.

Every person who, under color of law, deprives or causes to deprive any person of his or her rights, privileges, or immunities secured by the Constitution "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. The

Supreme Court has previously recognized that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

The Eight Amendment protects the rights of convicted prisoners, and the Fourteenth Amendment protects the right of pretrial detainees. *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 307 (10th Cir. 1985). A pretrial detainee's Fourteenth Amendment "claim for inadequate medical attention must be judged against the deliberate indifference to serious medical needs test." *Estate of Hocker by Hocker v. Walsh*, 22 F. 3d 995, 998 (10th Cir. 1994).

The deliberate indifference standard comprises both subjective and objective components. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citing *Callahan v. Poppell,* 471 F.3d 1155, 1159 (10th Cir. 2006)). The objective component is met where a deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  "A medical need is [objectively] serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (quoting *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005)).

Under the subjective component, a prison official must have a "sufficiently culpable state of mind." *Self v. Crum*, 439 F.3d 1227, 1230-31 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 834). "In prison-condition cases that state of mind if one of 'deliberate indifference to inmate health or safety.'" *Wilson v. Seiter*, 501 U.S. 294, 301 (1991). However, a prisoner's mere disagreement with a diagnosis or treatment course does not itself state a constitutional violation. *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). Moreover, "[a] negligent failure to provide adequate medical care, even one

constituting medical malpractice, does not give rise to a constitutional violation." *Id.* (citing *Estelle*, 429 U.S. at 105-06). Only an individual who "knows of and disregards an excessive risk to inmate health or safety acts with deliberate indifference." *Clark*, 895 F.3d at 1267 (quoting *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005)).   Furthermore, a delay in a prisoner's medical care only constitutes a constitutional violation where the plaintiff can show the delay resulted in substantial harm. *Oxendine v. Kaplan,* 241 F.3d 1272, 1276 (10th Cir. 2001).

Here, Mr. Oatis, a pre-trail detainee, failed to plead facts sufficient to establish a constitutional violation under the Fourteenth Amendment. First, Mr. Oatis failed to show that his medical need was sufficiently serious as to satisfy the objective component. Mr. Oatis's end-stage degenerative joint disease and osteoarthritis were not so obvious that a lay person would easily recognize the need for medical attention. *See Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). Rather, the diagnosis of Mr. Oatis's health issues required the evaluation and subsequent diagnoses of medical professionals, including providers at DCCF and outside providers. **UF 4, 5, 8, 9, 11, 13, 17, 18, 22.** These evaluations and diagnoses were made available to Mr. Oatis through referrals by ACH staff. **UF 4, 10, 12, 15, 16, 20, 21, 23.** Furthermore, Mr. Oatis's alleged health issues required treatment and appropriate interventions provided by and at the discretion of medical professionals. **UF 3, 6, 7, 14.** Therefore, Mr. Oatis's alleged health issues were not apparent to a layperson, but rather required professional medical evaluation and treatment.

Furthermore, Mr. Oatis cannot support that Defendants' actions resulted in the denial of Mr. Oatis's alleged necessary care. As referenced above, in order to establish the objective component for a claim of deliberate indifferent to an inmate's serious medical needs, Mr. Oatis must identify a medical need as to which "the delay [in providing treatment] resulted in substantial harm." *Oxendine*, 241 F. 3d at 1276. Here, Mr. Oatis alleges that he experienced

physical and emotional anguish arising from his chronic pain. **UF 19.** Specifically, Mr. Oatis takes issue with the timing of the care provided in relation to his hip replacement. However, Mr. Oatis received timely and consistent care.

Additionally, the alleged "delay" in treatment arises from multiple providers opining that Mr. Oatis's hip replacement was elective and, as such, should be deferred until Mr. Oatis was no longer incarcerated. **UF 5, 11.** As such, the alleged "delay" was not a negligent delay but rather intentional and appropriate compliance with the recommendations of treating physicians. Absent evidence, including expert testimony, that Mr. Oatis suffered substantial harm as a consequence of the recommendations of the treating physician, Mr. Oatis fails to adequately plead the objective component of a claim of deliberate indifference to his serious medical needs.

Second, Mr. Oatis failed to support the subjective component by showing that Defendants were deliberately indifferent to Mr. Oatis' medical conditions. "The subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self v. Crum*, 439 F. 3d 1227 (10th Cr. 2006). Here, Defendants appropriately exercised their medical judgment in their treatment of Mr. Oatis. Within the facility, Defendants provided appropriate treatment, accommodations, and interventions for Mr. Oatis' hip pain and osteoarthritis through a surgical excision, pain medication, medical shoes, and a soft mattress. **UF 3, 6, 7, 14.**

Furthermore, Defendants referred Mr. Oatis to multiple outside medical professionals, including but not limited to Luis Salazar, MD, Adam Goodyear, MD, and James Hutton, MD. **UF 5, 8, 9, 11, 13, 17, 18.** Each of these providers opined that a total hip replacement surgery should be deferred until Mr. Oatis was no longer incarcerated due to risk of infection and inconsistent rehabilitation. **UF 5, 11.** Furthermore, these providers offered Mr. Oatis cortisone injections for

his hip to help manage the pain while awaiting surgery. **UF 9, 13.** However, Mr. Oatis repeatedly denied said injections. **Id.**

In September of 2021, Mr. Oatis stated that he no longer trusted the above-mentioned providers and demanded to be seen by a specialist in Kansas City. **UF 12.** To accommodate Mr. Oatis, Defendant Stroda requested a referral for Mr. Oatis from providers at Lawrence Neurology. **UF 20.**

In November of 2022, Matthew Perry, MD evaluated Mr. Oatis and recommended arthroplasty surgery. **UF 22.** However, Dr. Perry did not have availability to schedule said surgery until 2023. **UF 23**. Although Mr. Oatis was informed of the delay, Mr. Oatis disregarded Dr. Perry's schedule restrictions and filed this suit on January 10, 2023.

As discussed above, Defendants provided a variety of appropriate treatment and accommodations to Mr. Oatis to address his medical concerns. Consequently, Mr. Oatis' allegations that Defendants were deliberately indifferent to his medical conditions are unsupported. Therefore, Mr. Oatis has failed to sufficiently plead a Fourteenth Amendment violation.

B.  Plaintiff Has Failed to Properly Support his Allegations of Medical Negligence.

Under Kansas law, to establish a claim for medical malpractice, a plaintiff must show that defendants owed him a duty, that they breached this duty, and that a causal connection exists between the breach and plaintiff's injuries. *Sharples v. Roberts,* 249 Kan. 286, 294 (1991). To meet this burden, plaintiff ordinarily must produce expert medical testimony on all three elements. *See id.,* 249 Kan. at 295. *Latshaw v. Mt. Carmel Hosp.*, 53 F. Supp. 2d 1133, 1138 (D. Kan. 1999). Furthermore, to show that a physician breached the standard of care, the patient ordinarily must provide expert medical testimony that defendant either did not possess the requisite

degree of skill or failed to use reasonable care and diligence in applying such care and skill. *Roesch v. Clarke*, 861 F. Supp. 986, 992 (D. Kan. 1994).

Here, Plaintiff cannot survive Defendants' Motion for Summary Judgment as Plaintiff has failed to offer expert medical testimony that criticizes Defendants' treatment of Plaintiff. **UF 24.** Consequently, Plaintiff has offered no expert testimony to support his allegations that Defendants breached the standard of care or that causal connection exists between the alleged breach and Plaintiff's alleged injuries. Therefore, Plaintiff failed to meet the burden necessary to support that Defendants breached their alleged duty to use reasonable care and diligence in the treatment of Plaintiff.

(a) *Plaintiff is Unable to Prove a Causal Connection Between Defendants' Actions and Plaintiff's Alleged Injuries.*

Under Kansas law, expert testimony is necessary in a medical malpractice action to establish that there is a causal connection between the breach and the injuries sustained. *Sharples*, 249 Kan. at 295. *Latshaw*, 53 F. Supp. 2d at 1138. Such a causal connection is equated with proximate cause, which arises when the natural and continuous sequence of events produces the injury, and without which, the injury would not have occurred. *See id.,* 249 Kan. at 295. *Latshaw,* 53 F. Supp. 2d. at 1138. Absent expert testimony as to the issue of causation, the case is not legally submissible to the trier of fact. *Sharples,* 249 Kan. at 294.

Here, Plaintiff failed to provide the requisite expert medical testimony to support his assertion that Defendants' alleged delay in treatment caused Plaintiff's injury and damage. **UF 25.** Pursuant to the scheduling order provided by this Court, Plaintiff's expert witness designations were due on May 17, 2024. **Id.** However, Plaintiff failed to submit said designations prior to or in

accordance with this deadline. **Id.** Therefore, Plaintiff is prohibited from offering expert testimony necessary to support his allegations.

(b) *In the Absence of Expert Testimony on Liability and Causation, Defendants are Entitled To Summary Judgment.*

A summary judgment movant can satisfy its burden of proof by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

As stated above, Plaintiff must produce expert medical testimony on liability and causation to support his allegation of medical negligence. *Sharples,* 249 Kan. 286, 294. It is clear from the record that Plaintiff cannot present the expert testimony necessary to show that Defendants were negligent or that Defendants' care, or alleged delay in care, caused an injury or damage to Plaintiff. Since Plaintiff's deadline to offer expert testimony has passed, Plaintiff is prohibited from offering additional expert testimony in support of his allegations. Therefore, Defendants are entitled to summary judgment on all of Plaintiff's claims.

(c) *This case does not fall under the Common Knowledge Exception to the Expert Testimony Requirement.*

An exception to the expert testimony requirement exists under Kansas law for medical malpractice cases arises where lack of reasonable care or existence of causation is apparent to an average layperson from common knowledge or experience. *Treaster v. HealthSouth Corp.*, 442 F. Supp. 2d 1171, 1180 (D. Kan. 2006). Kansas courts have identified three essential elements to the common knowledge exception: (1) the plaintiff has asserted a claim of medical malpractice, (2) the care or result of the care is patently bad, and (3) a person without pertinent medical knowledge can assess the wrongfulness of the diagnosis, treatment, or care and attribute the plaintiff's injury to the wrongful conduct without the assistance of expert testimony. *Perkins v. Susan B. Allen Mem*

*'l Hosp.,* 36 Kan.App.2d 885, 889 (2006). The application of the common law exception is extremely limited to patently obvious breaches of the standard of care. *Munoz v. Clark*, 199 P.3d 1283, 1288-89 (Kan. Ct. App. 2009).

Specifically, Kansas courts have generally declined to apply the common knowledge exception when the care at issue could reasonably have required any level of medical knowledge or discretion. *See, e.g., Cunningham v. Riverside Health Sys., Inc.,* 33 Kan. Ct.App.2d 1 a *2 (2004) (finding exception did not apply where a nursing facility assistant negligently fractured the leg of a patient suffering from osteoporosis); *Webb v. Lungstrum,* 223 Kan. 487, 491 (1978) (finding exception did not apply where a surgeon failed to x-ray a wound to discover an imbedded metal fragment but completed surgery leaving the fragment inside).

The most common types of cases where lay testimony has been held sufficient to establish a prima facie case of negligence on the part of a physician are cases in which the health care provider has left some object in a patient's body. *Capps v. Valk*, 189 Kan. 287 (1962) (drain tube); *Rule v. Cheeseman*, 181 Kan. 957 (1957) (gauze); *Bernsden v. Johnson*, 174 Kan. 230 (1953) (metal disk in throat). Additionally, performing a laminectomy on the wrong disc was held to fall within the common knowledge exception in *Schwartz v. Abay*, 26 Kan. App. 2d 707, 710 (1999). None of these fact patterns apply in this case.

The court ruled that the common knowledge exception did not apply in *Tudor v. Wheatland Nursing L.L.C. Tudor v. Wheatland Nursing L.L.C.*, 42 Kan. App. 2d 624 (2009). The court noted that while laypersons may have experience in caregiving, or providing others with assistance in daily living activities, such knowledge and experience does not necessarily equate to a general understanding of the level of care required of nursing home staff. Tudor, 42 Kan. App. 2d 624, With the same reasoning, the court did not apply the common knowledge exception in *Hubbard v.*

*Mellion. Hubbard v. Mellion*, 48 Kan. App. 2d 1005 (2013). The court determined that the proper procedure for using a rongeur during surgery was not a matter within the province of the common person. Like in *Tudor and Hubbard*, this case necessitates a general understanding of degenerative joint disease and osteoarthritis, treatment options, and timing of treatment and rehabilitation, all of which are not within the common knowledge and experience of the average person who has not received any specialized training. *Tudor*, 42 Kan. App. 2d 624 (2009); *Hubbard*, 48 Kan. App. 2d 1005 (2013). The initial evaluation, referrals to appropriate providers, and other interventions are sufficiently complex and require medical knowledge that rise above the knowledge of a layman. Therefore, Plaintiff failed to show that causation is so obvious as to excuse the requirement of expert testimony. Consequently, Plaintiff is not excused from providing the required expert testimony regarding the standard of care.

    C.   <u>Plaintiff Has Failed to Properly Support his Allegations of Intentional Infliction of Emotional Distress.</u>

Under Kansas law, an intentional infliction of emotional distress arises when (1) the conduct of the defendant must be intentional; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress, and (4) the plaintiff's mental distress must be extreme and severe. *Gudenkauf v. Stauffer Commc'ns, Inc.*, 922 F. Supp. 461, 464 (D. Kan. 1996). Conduct is not extreme and outrageous unless regarded as exceeding the bounds of decency or as utterly intolerable in a civilized society. *Wiehe v. Kukal*, 225 Kan. 478, 482, 592 (1979).

Here, it is unlikely that Defendants' provision of appropriate and continuous medical treatment to Plaintiff will be considered extreme or outrageous as to exceed the bounds of human decency. As stated above, Defendants consistently provided appropriate treatment to Plaintiff

including medical interventions and various referrals and examinations by independent providers. **UF 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 16, 17, 20, 22, 23.**

Furthermore, Plaintiff failed to show how Defendants alleged actions are casually connected to Plaintiff's alleged severe and extreme mental distress. Rather, Plaintiff briefly alleged "intentional infliction of emotional distress caused by medical…" which caused him to seek mental health counseling. **Exhibit 1, p. 13.** This assertion fails to explain or support how Defendants' actions allegedly gave rise to Plaintiff's extreme and/or severe emotional distress. Therefore, Plaintiff fails to support his assertion of intentional infliction of emotional distress against these Defendants.

### III.    CONCLUSION

Defendants Melanie Stroda, NP, Tamara Lyles, RN, and ACH move for summary judgment arguing that Plaintiff has failed to plead a claim upon which relief can be granted.

WHEREFORE, Defendants respectfully move this Court for an Order granting summary judgment in favor of Defendants and for such other relief as the Court deems proper and necessary.

*Respectfully submitted,*

**NORRIS KEPLINGER
HICKS AND WELDER, LLC**

By: /s/ John Hicks
John Hicks, jh@nkfirm.com #20474
11551 Ash Street, Suite 200
Leawood, KS 66211
(913) 663-2000 Office
(913) 663-2006 Fax
**ATTORNEYS FOR DEFENDANTS
MELANIE STRODA, NP, TAMARA
LYLES, RN, AND ADVANCED
CORRECTIONAL HEALTHCARE**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the above and foregoing was field and served via the

Court's ECF system this 8th day of July 2024, and by U.S. Postal Mail on the following:

Perry L. Oatis
1517 Lynch Court
Apt. 4
Lawrence, KS 66045
**PLAINTIFF PRO SE**

and via electronic mail to:
Michael Seck
Fisher, Patterson, Sayler & Smith, LLP
51 Corporate Woods, Suite: 300
Overland Park, KS 66210
913-339-6757/913-660-7919 FAX
mseck@fpsslaw.com
**ATTORNEY FOR BUNTING, ARMBRISTER, AND ROOME**

/s/ John Hicks
John Hicks